[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I History of Case
On January 19, 1989 Harold Fischel made application for a prejudgment remedy to attach inventory, machinery, office equipment, accounts receivable and bank accounts preparatory to commencing an action against Verkerke Reproductions, U.S.A. Inc. and PosterAmerica, Inc. for breach of a commercial lease. On February 1, 1989 the Court, Riefberg, J., directed that an attachment in the amount of $35,000 issue against sufficient assets. This case was later dismissed and on March 8, 1989 another application came to this court. The docket number for this action is CV BR-8903-00792. On April 24, 1989 the court ordered an attachment in the amount of $24,140.19.
Fischel claims damages for unpaid base rent and lost income through the term of the lease or alternatively, for PosterAmerica's unjust enrichment to Fischel's detriment.
On March 15, 1989 PosterAmerica, Inc. and Robert Walsh, its president, brought suit against Harold Fischel. The docket number of this action is CV B.R. 8903-00798.
In its suit Posteramerica claims that as a result of the attachment of February 2, 1989, Fischel illegally entered and detained the property of the defendant, interfering with the CT Page 7545 possession of the premises, causing PosterAmerica economic loss by wrongful conversion and interfering with existing contracts between PosterAmerica and its creditors and customers. Further it alleges that Fischel violated Connecticut General Statutes 42-110a
et seq. (hereafter CUTPA) and caused the defendant mental suffering; and claims that it no longer has any obligation to Fischel as the entry and detainer action terminated the obligations of PosterAmerica.
Both cases were tried together to the court beginning May 3, 1991.
II Facts
The court finds the following facts. Fischel owns commercial property at 575 Broad Street, Bridgeport. In April 1986 he entered into a five year lease agreement with defendant Verkerke. In October 1988, Verkerke vacated the premises and defendant PosterAmerica took possession. Fischel had not consented to the assignment to PosterAmerica. Negotiations ensued between Fischel and Robert Walsh, President of PosterAmerica. Through December 1988 Walsh made monthly payments to Fischel in the same amount of rent paid by Verkerke. No agreement emerged and in November 1988 the parties and their attorneys met. Walsh threatened to file for bankruptcy asserting he would move his business. The plaintiff later learned that Walsh was moving property from the Broad Street premises. Believing that his rights as lessor were threatened, Fischel attached some of the corporation's assets on February 2, 1989 and brought suit for breach of the lease agreement.
III Discussion
There is no dispute that on February 2, 1989 Sheriff Alan Freedman attached PosterAmerica's business assets. No goods were removed from the premises; instead Sheriff Freedman made Charlie Card, Fischel's property manager, the "keeper" to ensure the safety of the goods. The sheriff testified that he instructed Mr. Card to securely lock all doors as the sheriff considered the neighborhood a high crime area. He proceeded to the bank to effect garnishments and left Sheriff Cioffi at the premises. Therefore, Freedman did not know whether or not any locks were changed; he had not directed anyone to change the locks. Both Card and Cioffi are since deceased. Their testimony was not preserved in depositions.
Fischel testified that he did not direct anyone to change the locks but was not sure whether or not they had been changed. He claimed that he instructed Charlie Card to allow Mr. Walsh free access to both the warehouse in a separate building and the office. It is the office area that is the subject of this case. Fischel indicated that the premises were entered by a common corridor and CT Page 7546 that the elevator went to each office floor. There was a door at the elevator on each floor and a door to the offices which had locks. He indicated that he never had the key to the corridor door because it was always open but had a key to the office; however, once Card locked the corridor door Walsh would have had to get a key from Card.
On cross-examination, Fischel indicated that he had keys to the premises from the time of the prior tenant, defendant Verkerke, and that he used both the keys to the anteroom and offices as of the last time he had visited the premises within one month of his testimony. He had been using the keys to gain access on those occasions when he was showing the premises to prospective tenants and that he had the same keys to the anteroom door from October 1988. He claimed he did not instruct anyone to keep Walsh away from the premises after February 2 although on one occasion Walsh appeared with two trucks and permission to enter was denied.
Regarding the availability and existence of keys, Mr. Walsh testified that employee keys were turned over to Card; that about five employees had keys on February 2 and that when he moved into the premises he had changed the locks but gave the keys to Fischel and Card. He further claimed he never tried his keys in the keyhole after the attachment took place. After the "lockout" he testified that he saw Card's keys open every door.
Walsh first testified that he was denied access to the premises from February 2, 1989 to the date of his testimony, May 10, 1991. Later he said he was not allowed free access. Questioned about the dates he had asked Card for permission to enter or whether he ever requested access in writing, or when he had verbally requested access of Fischel, he said he could not recall. At a later point he claimed he was sometimes allowed into the premises. He did not recall the first time he had obtained permission. Defendant's Exhibit 4 is a copy of an acknowledgment signed by Card and initialled by Walsh indicating that Walsh had access on February 28, 1989 to remove books and records. Further when questioned about the allegation in his complaint that he had not had access from February 2 through February 17, 1989 he reiterated he had not had access from February 2 to the then current date, May 13, 1991. Still later under questioning by his attorney, Walsh stated that he had gone to the premises six or seven times but never unannounced; that he had announced and planned the visits with Fischel and Card. He made four or five trips to take records out. Later on re-cross examination he testified that he was not threatened or physically barred from entering the premises. When asked why he believed himself denied access he stated that it was because of the sheriff's notice posted on the door and the fact that Card called Fischel's attorney. CT Page 7547
Throughout his testimony Walsh claimed not to recall events or dates or amounts on matters that were of consequence to the case. His manner was evasive. The court did not find him a credible witness.
A more credible witness on his behalf was Lydia Ortiz who was one of two PosterAmerica employees working at the premises on February 2, 1989. She testified that Card entered the office area with two other men who walked in and out of the offices and then instructed her to leave. She observed a maintenance man changing the lock on the main door by the elevator but she did not attempt to put the key into the lock. She claimed she gave her keys to Card upon leaving and did not return to the premises. Because she testified she was working on the premises the court did not find abandonment.
A threshold issue to be addressed is whether or not Howard Fischel violated subsection (4) of Connecticut General Statute 47a-43. That section provides for a cause of action by a "party put out of possession (who) would be required to cause damage to the premises or commit a breach of the peace in order to regain possession. . . ." This section of the statute is perhaps not so relevant as subsection (3) which concerns a situation wherein entry is made and the personal property of the possessor is detained. Fischel entered armed with an ex parte court order. In seeking to "attach" property he caused its detention when those acting on his behalf changed the locks. The changing of the locks coupled with the plaintiff's control of access to the premises constitutes the violation.
PosterAmerica also claims that Fischel wrongfully converted its property. Conversion arises when there has been an "unlawful exercise of dominion over goods or chattels belonging to another who is entitled to their immediate possession." Healey v. Flammia,96 Conn. 233, 235.
To succeed in a suit for conversion, the plaintiff must allege and prove legal ownership or the immediate superior right of possession of the property and the fact that the defendant exercised unauthorized dominion to the exclusion of the plaintiff's rights. Devitt v. Manulik, 176 Conn. 657, 662. See also Falker v. Samperi,190 Conn. 412, 419.
Fischel's exercise of dominion was authorized as he had obtained an ex parte order to attach property. Furthermore, Walsh's testimony as to what constituted the property under attachment was incomplete at best. There was no specificity as to what the items were or their value.
Sheriff Freedman testified that he did not do an inventory of the goods attached at the premises. He claimed there was too little property of too little value. He recalled that among the items CT Page 7548 attached were desks, file cabinets and miscellaneous office equipment. In the factory there were worktables, loose tools, a forklift and two pallets on which were piled cardboard-type material. Walsh claimed there were assets like computers and telephones on the premise and stated that later, Fischel allowed him to remove hanging racks and posters. Walsh testified that he made four or five trips to Broad Street at which times he removed invoices, financial statements, bank statements, accounts payable, Verkerke records and the like. On redirect examination by his attorney, he admitted he took some inventory and items he claimed had little value. It is unclear whether or not PosterAmerica owned outright all of the items attached. It is significant that at no time did he file a complaint with the police as to items having been stolen. The court does not find illegal conversion of PosterAmerica's assets.
In his Fourth Count Walsh alleged that business losses occurred as a result of the "lockout." He testified that in October 1988 he had between fifty to seventy-five employees at Broad Street. At another point in the trials he said he had one hundred employees. He further testified that in January he had twenty-five employees and was "running a full shop." However, only two employees were apparently on the premises on February 2, 1989. Walsh admitted that he planned to consolidate the business with another poster company he owned, World Class Publications, Inc. in Hartford. To that end he had already moved computers and some records to the Hartford location. He also admitted that he planned to pay Fischel for six months and then vacate the premises; therefore he had begun moving employees and equipment in January 1989. He did not specify what equipment he removed, nor how many employees he transferred but conceded he was negotiating with Fischel with the aforementioned plan in mind. Mrs. Ortiz testified that she knew she would be transferred to the Hartford operation.
Questioned by opposing counsel as to whether, had he been allowed to reenter Broad Street premises on February 10, 1989, he would have lost his business, Walsh said he did not know. He claimed the business did not operate for approximately six months but did resume in Hartford in June or July. He admitted that World Class Publications distributed posters to some of PosterAmerica's customers. He claimed that he lost 1000 customers, most notably a customer named Winterland, which was a distributorship of rock and roll posters. However, he could recall no steps he took to notify creditors or customers of a change in location. He asserted that contacting customers would be very expensive and embarrassing and he did not have sufficient inventory or records to warrant contact. Nor could he produce any letters from customers or creditors complaining about their inability to contact PosterAmerica.
Fischel subpoenaed PosterAmerica's bank records. Walsh CT Page 7549 brought checking account statements from an account at Sentinel Bank. That was one of three accounts the company apparently had. Two bore the name of the account holder as PosterAmerica aka Verkerke Publications with a mailing address of Class Publications in Hartford. (Defendant's Exhibits R and L) When asked why the accounts read in this manner Walsh stated he did not know. Further he said that he would bring the records of the other accounts with him to court the following court date. He indicated these records were still at Broad Street; however, he failed to contact Fischel to obtain access to the premises between his days of testimony and did not produce them in subsequent testimony.
The Sentinel checking account statements put into evidence show that the account was credited with $367,553 in November. Walsh stated that this was a good period. There was a decrease in amounts deposited through February. In March and April the credits increased somewhat through June but fell thereafter. Throughout several of these months checks were returned by the bank unpaid corroborating Walsh's other statements regarding PosterAmerica's inability to meet its financial obligations as early as the fall of 1988.
It is difficult, if not impossible, for the court to conclude that Walsh sustained business losses solely as a result of the events of February 2, 1989. Had other bank statements been submitted it might have been possible to develop a picture of the rise and fall of the company's business at Broad Street. A summary prepared by Walsh was not conclusive.
The court finds that before Fischel's attachment, Walsh had taken significant steps to move the business operation from Bridgeport to Hartford. Walsh and PosterAmerica were having financial troubles soon after purchasing the Verkerke business; hence Walsh's insistence upon negotiating a new lease for a lesser rent. Thus the court cannot conclude that the "lockout" caused a decrease in revenue to PosterAmerica.
In the Fifth Count of his complaint Walsh claims damages for the intentional infliction of emotional distress. The Connecticut Court in DeLaurentis v. New Haven, 220 Conn. 225, 267 set forth the necessary elements for such a claim:
 "`In order for the plaintiff to prevail in a case for liability under. . . (the intentional infliction of emotional distress), four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's CT Page 7550 distress; and (4) that the emotional distress sustained by the plaintiff was severe. Hiers v. Cohen, 31 Conn. Sup. 305, 329 A.2d 609 (1973); 1 Restatement (Second), Torts section 46.'" Petyan v. Ellis. 200 Conn. 243, 253, quoting Murray v. Bridgeport Hospital, 40 Conn. Sup. 56, 62 (1984).
The four elements are not present in the instant case. Walsh offered no testimony regarding severe emotional distress. He did not seek medical attention nor did he testify as to any symptoms of emotional distress and therefore failed to meet his burden of proof.
Walsh claims Fischel's actions constituted a violation of Conn. Gen. Stat. 42-110a ff. Connecticut General Statute 42-110b provides that "(n)o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In subsection (d) the legislature specifies that "(i)t is the intention of the legislature that this chapter be remedial and be so construed." Section 42-110a (4) provides that "trade" and "commerce" include the "sale or rent or lease. . . of any (real) property. . . in this state." Fischel is the owner of commercial properties which he leases; as such he is within the purview of the act.
In Conaway v. Prestia, 191 Conn. 484, (1983) the Connecticut Supreme Court quoted FTC v. Sperry Hutchinson Co., 405 U.S. 233, 244n. in enumerating the factors to be considered in a CUTPA evaluation:
 "`(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . .'" at 492-93
A violation of CUTPA may be established by showing a practice amounting to a violation of public policy. Web Press Services Corporation v. New London Motors Inc. 203 Conn. 342, 355. A breach of public policy, in turn, may result from a violation of another statute. Tillquist v. Ford Motor Co. 714 F. Sup. 607, 616 (D.Conn. 1989). (See also Daddona v. Liberty Mobile Home Sales Inc., 209 Conn. 243,257-258.) The violation of section 47a-43 of the statutes breaches public policy and therefore violates CUTPA.
Fischel's suit against PosterAmerica, No. 00792, is based upon CT Page 7551 the premise that PosterAmerica became obligated to honor the lease as the assignee of Verkerke. In its Answer on May 9, 1990 to the Amended Complaint of September 9, 1989, PosterAmerica neither admits nor denies this allegation.
However, in its own suit against Fischel dated March 15, 1989, PosterAmerica had already admitted that "(O)n or about October 31, 1988 Verkerke assigned its interest as lessee under the aforesaid lease to the Plaintiff PosterAmerica."
This allegation is a judicial admission. "Judicial admissions are voluntary and knowing concessions of fact by a party. . . occurring during judicial proceedings. (citations omitted.) They excuse the other party from the necessity of presenting evidence on the fact admitted and are conclusive on the party making them." Tait and LaPlante's Handbook of Connecticut Evidence, 2nd ed. 1988, sec. 6.5, p. 132.
The original complaint was not superseded by a revised or amended complaint and it was on this complaint that Walsh and PosterAmerica proceeded to trial. "When a factual allegation in a complaint. . . is admitted that fact cannot be disputed at trial."
At the trial in which both cases were heard simultaneously, Walsh denied that there had been an assignment. He claimed that he paid Fischel the same monthly amount as had Verkerke "in good faith" only. He testified that he did not believe he was bound by the terms of the lease so that at the time of the November 1988 meeting he was free to negotiate a new one on new terms. For a business person such naivete was not credible.
Pursuant to the Asset Purchase Agreement (Plaintiff's Exhibit D) Verkerke transferred all its "right, title and interest" in and to its assets other than to certain specified ones. Fischel argues that Rocklen, Inc. v. Radulesco. 10 Conn. App. 271, 273 (1987) is dispositive of the matter. In that case, however, the landlord consented in writing to the assignment. In the situation here, Fischel did not consent. However, once Verkerke sold its business Fischel accepted the assignment as a fait accompli and objected to negotiating new terms and lower rent.
Walsh's denial of an assignment at trial may well render the judicial admission an evidentiary admission. Even if such were the case the Court would still find that an assignment of the lease occurred. As the Rocklen court stated ". . . an assignment of a lease is a sufficient consideration to support the legal obligation of the defendant to pay rent." at 275. Here, Verkerke's assignment of the lease as admitted by PosterAmerica, was sufficient consideration to support PosterAmerica's legal obligation to pay rent to Fischel. CT Page 7552
III Damages
The burden of proving damages is on the party claiming them. Gargano v. Heyman, 203 Conn. 616, 620; Conaway v. Prestia, supra, 493-94.
PosterAmerica claims damages pursuant to section 47a-45a of the General Statutes and double damages under section 47a-46. Fischel proceeded upon an; ex parte prejudgment attachment that inadvertently resulted in a "lockout". The court finds that double damages are not appropriate as no force was involved. However, the court finds judgment for PosterAmerica on the first count in the amount of $1000.
As to the CUTPA claim, the Court looks to Section 42-110g(a) which provides as follows:
 "(a)ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited in Sections 42-110b may bring an action to recover actual damages. . . . The Court may award punitive damages and provide such equitable relief as it deems necessary or proper."
The court finds that no credible evidence was produced by Walsh as to ascertainable business loss.
"In order to award punitive damages, evidence must reveal a reckless indifference to the right of others or an intentional and wanton violation of those rights." Collens v. New Canaan Water Co.155 Conn. 477, 489; Tillquist v. Ford Motor Credit Co., 714 F. Sup. 607,617 (D.Conn. 1989). The court finds that there is no evidence of reckless indifference on the part of Fischel and does not award punitive damages.
The Act also provides for an award of costs and reasonable attorney's fees based on the work reasonably performed by an attorney. "Absent contractual or statutory authorization there can be no recovery, either as costs or damages, for the. . . expenditure for counsel fees by a party from his opponent. Buccino v. Cable Technology, Inc., 25 Conn. App. 676, 679. The court finds that there was no clear evidence as to the amount of attorney's fees attributable to the PosterAmerica lawsuit. Defendant's Exhibit 6 purportedly represents attorney's fees billed to Walsh in May 1989. Prior charges totalled $18,138.64. Walsh testified that this amount represented bills for legal services rendered and costs in connection with both cases herein. This was corroborated by counsel's affidavit regarding attorney's fees. There is no statutory or contractual provision for attorney's fees in PosterAmerica's claims except in CT Page 7553 the case of the CUTPA violation. Walsh and PosterAmerica did not prevail on the majority of their claims. The court has no evidentiary basis for allocating legal services between the two cases and the various claims. However, the court finds that reasonable attorney's fees for the CUTPA claim is $3000. The court is unable to determine the nature or amount of the individual expenses and therefore awards PosterAmerica the court entry fee of $55 and the sheriff's fees of $50. A Writ of Restitution shall issue for those items, if any, claimed by Walsh and PosterAmerica which remain at the Broad Street premises.
Attorney's fees in Fischel's suit are provided for by the lease itself. The third section provides that the "Tenant agrees to pay as additional rent all attorney's fees and other expenses incurred by the landlord in enforcing the obligations under this lease." Since Fischel's actions prompted PosterAmerica's claim he is not awarded attorney's fees for those services rendered in defense of the PosterAmerica claim Counsel's affidavit also shows no allocation as to those fees incurred in Fischel's action. However, the court finds that reasonable attorney's fees are $5000 and costs are $1174.65.
PosterAmerica and Walsh argue that they should not be liable for damages claimed by Fischel. Walsh admitted in testimony that he owed rent for the month of January (although Fischel's complaint stated "February"). But he claims that Fischel's "lockout" terminated the lease thereby releasing PosterAmerica from its obligations. But by failing to pay January's rent, PosterAmerica breached the lease. The court rejects PosterAmerica's argument that the plaintiff breached the lease by reason of the "lockout."
The Connecticut court has held that when a lessee breaches a lease for commercial property the landlord may terminate the tenancy and mitigate his damages. "A lease is nothing more than a contract. . . Thus. . . the measure of damage is that the award should place the injured party in the same position as he would have been had the contract been fully performed. . . (T)he unpaid rent, while not recoverable as such, may be used by the court in computing the losses suffered by the plaintiff by reason of the defendant's breach of contract of lease." Rokalor, Inc. v. Connecticut Eating Enterprises, Inc. 18 Conn. App. 384, 388-389.
Fischel testified that he showed the space repeatedly from as early as January 1989. Plaintiff's Exhibit "G" is a list of legitimate prospects for the Verkerke premises compiled by Fischel. He testified that he used newspaper advertisements and realtors to attract tenants. Rent in the Verkerke lease was calculated at $4.225 per square foot for 32,314 square feet.
Fischel seeks judgment in the amount of $398,532.33 which CT Page 7554 sum includes base rent, and sums for the security guard and electricity. He holds a security deposit in the amount of $12,805. Rent from a successor tenant for 6000 square feet of space at $2.25 per square foot is $2250. Deducting the total of these latter amounts, $15,035, the court finds judgment for Fischel in the amount of $383,477.33 in damages for breach of the lease agreement. (A remedy under unjust enrichment is not applicable when there is a contractual remedy available. (Menard v. Gentile, 7 Conn. App. 211,215.)
Leheny, J.